Mr. Justice Clayton
delivered the following dissenting opinion :
This is the same case which is reported in 3 Howard, 259, between the same parties. The judgment was then reversed, ‘and the cause reminded, because of error in the charge of the court. ! . !
According to the proof then before the court, the notary who made the protest, directed the notice to the defendant at Washington city, who was then a member of the senate of the United States, and in attendance upon congress, at the time of the protest, and for some time afterwards. The notary did not know the residence of Mr. Walker, nor did he make any inquiry to ascertain it. The defendant proved that he was a citizen of the state of Mississippi, and a senator in congress from that state, and that he had changed his residence in September, 1835, from Natchez to Madison county. It was also in proof that Madison county was his last known place of residence, although after he went to congress, in the month of January, 1836, he had not returned to that county, at any time before the protest and notice in question, which was in February, 1837. The jury found a verdict in favor of the plaintiff, upon which judgment was rendered. Upon this state of facts, this court decided “ that the notice sent to Washington city, was not sufficient to charge Walker as indorser; but if he had no known place of residence in Mississippi, or .if, after diligent inquiry, his place-of Residence could not be ascertained, then the notice might be good, but without such showing it was insufficient.” The cause was remanded foj a new trial, when a verdict. was. rendered for the defendant. No charge was asked of. the court, no exceptions filed in the progress of the trial; but after verdict, and a motion for a new trial had been overruled, a bill of exceptions was filed, in which the testimony is set forth.
The testimony contained in the present record, although more full on both sides than on the first trial, does not materially vary the case. Judge Black, the associate of Mr. Walker in the senate, proves that the defendant, in the winter of 1837, during the session of congress, was in the habit of receiving, many letters. *662 Colonel Claiborne, a member of the house of representatives from this state, proves that in the congregational register or directory, in 1836, 37 and 38, Mr. Walker designated his residence to be Madisonville, Miss. There was no additional evidence of any inquiry to ascertain his residence, at the time of the protest. The question to be determined on the last trial, therefore, must have been, whether Mr. Walker had a residence at the time in this state; for if he had, the court had already determined tfye notice not to be good. The fact of the sale of his plantation in Madison county, has been relied on, to show an abandonment of his residence. In my view of the testimony it cannot have that effect, because the reservation of a portion of the land to erect buildings upon, and the reservation of a right to occupy the original buildings for some eighteen months, to enable him in the mean time to erect new buildings, evince an intention not to abandon. Two witnesses, moreover, who were present at the time of the contract, testify to his declaration that he did not mean to give up his residence in Madison.
This was a question of fact for the jury,, though some rules which have been established, might have aided their investigation. Thus it has been laid down, that a domicil once acquired, remains until a new once has been acquired, and the presumption, in all cases, is against a change of domicil. Story Con. Laws, 2d edition, 46. The case of Somerville v. Somerville, 5 Ves. 756, in some of its features bears a strong resemblance to this. Lord Somerville, as one of the Scotch peers, had a seat in the parliament of Great Britain; he spent most of his time in London, had a house in that city, and showed some intention of making it his permanent domicil. After his death, to determine the succession to his personally, it became necessary to establish his residence. It was decided to be Scotland, because the presumption is against a change of domicil, until an abandonment and substitution of a new one are shown.
In this case there were no instructions asked for, there was no positive evidence that Mr. Walker had abandoned his residence, and the verdict is in accordance with the principles just asserted. It was a matter of fact, on which the proper triers *663 have passed, and I do not think it is for us to disturb their finding, unless palpably wrong.
With this finding of the jury, upon the only point left open ? by the former decision of this court, the present judgment could / not be reversed, without overturning that decision. I am not , disposed to do this, because my inclination is to adhere to decisions once deliberately made, unless convinced that they are very clearly wrong. A very recent work of an eminent jurist confirms the principle of the former decision. It is thus stated: “ If the party entitled to notice is abroad, at the time of the dishonor, the notice should be left at his regular residence or domi-cil in his own country; if he has changed his residence or domicil, and his new residence is known, notice is there to be given.” Story on Bills, 346. A late case, in the supreme court of Massachusetts, decides, under circumstances almost identical with this, that notice sent to Washington city, was good. Pierre Chateau v. Daniel Webster. Law Reporter, October, 1843. But 1 do not feel willing to recede from the decision of our own court,' upon the authority of a single case from another tribunal. , n
The jury here have decided that there was no change of re si-) dence, or, what is the same thing, that he still had a residence V in this state ; and that, according to my understanding of the former decision, settles this case. But a majority of the court being of a different opinion, the judgment is reversed.
Mr. Walker, after delivery of the opinions in this case, filed the following petition for reargument:
The defendant applies for a rehearing and reargument, and respectfully contends, that the court erred as to the facts and the law. The question of the residence, depends upon Walker’s residence, on the 4th February, 1837,' the date of the protest, and not at any subsequent period. The residence, up to the 5th May, 1836, the date of the contract with Fall, is proved and conceded. But it is said, that, by that contract, and from that date, the residence was abandoned. To sustain this, the court lay great stress on what they call “ the sale to Fall.” *664 Now there never was a sale to Fall, nor was he ever vested with a title to the property. On the contrary, the supplemental agreement proves there was no such sale, nor had he ever any such title. The words are, “supplemental agreement — It is agreed further between George R. Fall, and Robert J. Walker, as follows. Whereas said Walker is now extending, repairing, and improving, the house on said Pearl Dale Place, this day contracted to be sold conditionally by said Walker, to said Fall.” There was then no sale, but only a conditional contract to sell. No deed was made or title passed, the title remained in Walker, and Fall had only a contract for a sale hereafter, on certain conditions. Was this contract ever changed into a deed, or these conditions ever performed ? There is no such proof, because such is not the fact, but were it otherwise, it would avail nothing, unless shown to have been done before the 4th of February, 1837. If the conditions were not performed before the 4th February, 1837, Fall would then have no right to call on Walker for a deud of sale, and all this must be proved by the plaintiff affirmatively, in order to establish the alleged abandonment of residence.
The errors of the court are, 1. They assume an actual sale to Fall. 2. That the conditions were performed by him; and 3. That the performance of the conditions and sale, preceded the 4th of February, 1837.
Important as these errors are, as to the sale, they are still more so on their influence Upon the court, in interpreting the supplemental agreement. The court treat the question, as if Fall was then, as they call him, “ the owner of the land,” and say, as to the agreement, “ there was no right of soil reserved.” But Walker had not parted with the right of soil, but had only agreed to do so hereafter, on certain conditions. When were these conditions performed! Was it on the 5th May, 1836? No, for they were to be performed thereafter. Was it on or before the 4th February, 1837? And yet this conditional contract to sell, is made ipso facto from its date to divest Walker’s title and residence. If then Walker’s title was not divested, and residence abandoned by the mere conditional contract of sale, what pro *665 duced these results on or before' the 4th February, 1837 ? The court say, “Williams testifies that hi 1836, he as the agent of Walker, delivered to Mr. Fall, the plantation and slaves. When Mr. Walker first saw the witness afterwards, he complained and said that the house ought not to have been delivered, but the land and slaves- only. "The house must then have been delivered, or Mr. Walker would not have complained.” . Here are many material errors. Williams says, “ Mr. Fall called on deponent, as Walker’s agent, to deliver up to him the place, which deponent first - refused,' having no orders from said Walker, but afterwards, when Mr. Fall showed deponent-the contract of sale, he did deliver the' place to said Fall.” “And he took possession then of the place and slaves, but not of the housej until the fall of 1837, and when said Walker first saw deponent thereafter, he complained, and said the house ought not to have been delivered, but the plantation and slaves only.” Now the court say, “Williams testifies, that in 1836, he, as the agent of Walker, delivered to Mr. Fall the plantation and slaves.” Now Williams says, the delivery was without any orders from Mr. Walker, and consequently not as agent, nor does he affix “ 1836,” or any other date to this delivery of the place and slaves. Nor had Fall, as the court state, possession of the house in 1836, for Williams, to whom they refer, swears he had not possession of “ the house until the fall of 1837,” more than six months after the notice, yet the court lay great stress on the supposed fact, that Fall was in possession of the house on the 4th February, 1837. When these mistakes are shown in the opinión, the court, it is believed, will desire to correct them, by a rehearing.
,The court say “Mr. Walker was never at Madisonville but once after the' sale, and then on a visit, and that his family were never there afterwards, although he and they were in the state in 1836 and 1837.” Now Claiborne says, “during the recess of congress in 1836, Mr. Walker returned to the state, but did not briug his family.” Mr. McFarrcn says, “ Mrs. Walker splint that summer (1836) with her friends in Philadelphia.” Now the recess of 1836, as the senate journals show, *666 was short, but why was it not spent by Mr. and Mrs. Walker at the Pearl Dale house'? Because it is clearly proved, the house was then being extended and repaired, and was not habitable until October, 1836, when it was nearly time to return to Washington. If then, Walker did riot forfeit his residence by the conditional contract of 5th May, 1836, nor by not residing there during the recess of 1836, when the house was uninhabitable, what produced the forfeiture of residence on or before the 4th February, 1837''? The court state the agreement, as “ entered into by Fall and Walker, after the sale of the plantation.” Now the agreement says, “ it is agreed further,” “ this day contracted to be sold,” and Mr. Fall says, “ said Walker insisted before entering into the contract with the undersigned for the sale of said Madison county place, upon reserving a residence, as.a prerequisite of the sale.” .The contract of sale and agreement were then continuous, and cotemporaneous acts, the one being made a “ prerequisite” of the other, and are to be construed as one act. The court attach importance to this clause, “ said Walker may occupy said house free of rent during the recess of congress, for a period not exceeding the fall of 1838.” The court say, “no right of property is spoken of.” Fall was “ the owner of the land.” Now Fall was not “ the owner of the land,” but held a mere conditional and unfulfilled contract, and no right of property was reserved, because it had never been parted with, but only a contract to part with it thereafter on certain conditions, and until these were complied with, Walker had both the right of property and of possession, and the reservation of the right of occupancy of the house, being only necessary in case of a compliance by Fall with the conditions of the contract. Therefore this reservation would only begin to operate after the compliance of the conditions by Fall, because, before and until such compliance, Walker held already the right of property and of possession, independent of the reservation, and Walker need only resort to the reservation for his right of occupancy, in case of, and after the fulfilment of the conditions by Fall. This is clearly the true meaning of these continuous and cotemporaneous acts. *667 But were it otherwise, what was the object of this clause 7 This clause is preceded by the statement, “ Whereas said Walker is still desirous of retaining and continuing his residence at said Pearl Dale Place.” The declared object of the clause - was, that Walker might retain and continue his residence at Pearl Dale. Yet the court, in opposition to the declared object and intention of the parties, construe this clause into an abandonment of the residence. Again, look at the verbal declaration of Walker at the time, and tjhe acts of both parties. Walker went to the Pearl Dale house in the recess of 3836; the house was completed at his expense, and not until October 1836, after which all the bills were.paid by Walker. But why all this, if Fall was then the owner of the house, and if Fall was the owner, and entitled to the possession of the house, why did he never take possession until the fall of 1837 7 and why, even after that, did Walker complain and declare he had no „ right of possession of the house 7 Fall’s conduct shows he considered that he had no right to the possession of the house until the fall of 1837, and Walker’s conduct shows, he considered Fall had even then, no right to the possession of the house, nor did he ever admit his right of possession.
Again, “in 1836, 1837, and 1838,” Walker, as Claiborne swears, gave in his residence at that place, and not, as the court suppose, only in 1836; and Claiborne, who was present at the contract of sale, swears, that “'Mr. Walker then assured witness, that he had' no thought whatever- of changing his residence, but intended to retain part of the land, and improve it, and remain there permanently.” Yet all these solemn acts, and cotemporaneous and repeated declarations, seem to be wholly rejected by the court, in deciding the question of residence ; and when Walker should be thrown on the supplemental agreement, by and after the fulfilment of the conditions of the contract of sale by Fall, he reserved not merely the occupancy of the house, but the right to select thirty acres near it, and for the use. of the spring, all indicating the fixed design' of a permanent residence. But suppose Walker had only rented the house, to occupy during the recess, the oply time *668 when he could ,be there, would this forfeit his residence there, because another might occupy it during the sessions of congress, when he must be at Washington 1
The residence is also supported by the testimony of Claiborne and McFarren, witnesses of or present at the contract of sale, and also by Halliday, Howell, Williams, and Barnard. They were all intimately acquainted with Mr. Walker, and with the facts; and Williams proves Walker’s directions to send his letters and papers to Madison, “ up to the 4th of February, 1837, and that they continued to come there, until after February, 1837.” Strange that he should have his letters directed, and that they should come to a place, which was not his residence; and stranger still, if he had abandoned this residence, that not a single witness could be produced to prove it. The testimony is, “Mr.„ Walker always claimed Pearl Dale as his residence, until it was sold to Dr. Puckett, in the fall of 1838.”
From all these facts, were not the jury well warranted to conclude, that Mr. Walker had not abandoned this residence, in February, 13371 The jury have so found the residence, upon their oaths; and being peculiarly a question of fact, of which they are the appropriate triers, the verdict should stand, unless the evidence “ greatly preponderate ” against it. Walker’s furniture, also, which must have been in the house, when he and his family occupied it, in 1835 and 1836, was not included in the agreement with Fall, and would not pass by a contract for the plantation and slaves, and this furniture must have been in the house in February, 1837.
The court say, “ a deed from Mr. Walker to Dr. Gwin, of certain land therein described, dated in December, 1836, in which Mr. Walker is described as a citizen of Madison county, was also read.” The evidence is, “ defendant also read a deed, recorded in Adams county, dated December 20, 1836, and acknowledged December 30, 1836, from William. M. Gwin, to said Walker, describing said Walker, in said deed, as a resident of Madison county.” Now it was important to prove, by Dr. Gwin, the residence of Walker in December, 1836. But Walker’s own *669 statement, as the court represents it, would be of less importance, particularly as similar statements by Mr. Walker, had been already proved.' The .court, thus, by an unintentional error, deprive Walker wholly of the benefit of Dr. Gwin’s evidence. The following mistakes, as to facts', it is respectfully contended, appear in the opinion of the court:
1. A conditional contract to- sell, is represented as an actual sale.
2. Fall is represented as the owner of the place and house on the 4th February, 1837, when he had nothing but a contract for a future sale, on certain conditions, then unfulfilled.
3. Fall is represented as being in possession of the house in February, 1837, whereas the witness referred to by the court states, Fall had not possession of “the house until the fall of 1837.”
4. The court say Mrs. Walker was in the state, but not at Pearl Dale, during the recess of 1836, whereas she spent that recess with her friends at Philadelphia.
5. The court represent a deed from Dr. Gwin to Walker, as a deed from Walker to Gwin, thus depriving Walker of Gwin’s testimony.
6. The court state the agreement as made after what they call the sale, whereas they were executed at the same time, the agreement being made a “prerequisite” of the contract of sale, both being contemporaneous and continuous acts, and to be taken as one act.
These are most important errors, and more might be designated, but these should be sufficient to prove, that the present opinion should be corrected, and that even if the case is remanded after a rehearing for a new trial, the court would no doubt cheerfully correct any material errors in their opinion, especially as to facts, so as not to permit any erroneous statements to influence the verdict of a future jury.
The constitution of this state; article 7, section 11, declares, “ Absence on business of this state, or of the United States, or on a visit, or necessary private business, shall not cause a forfeiture of citizenship or residence once obtained.” As then *670 Walker was a resident of the state, notwithstanding his “ absence on business of the state,” on, the 4th February, 1837, if his residence was not then in Madison, it must have been at Natchez, and if so notice should have been given there, yet the court seem to have overlooked this material alternative.
Having examined the facts, let us now investigate the legal questions. If Walker had a residence at Madison or Natchez, two questions arise. 1. Was the notice to Washington good 1 2. Was there no necessity of any notice whatever'? These are distinct questions, and must not be confounded, as it is respectfully contended they have been by the court. Both these questions were clearly and unanimously decided by the court before, (then composed of Judges Sharkey, Pray, and Trotter,) in Walker’s favor. 3 How. 264. First, was the notice to Washington good? The court say it was; first, because it was proved he was in the habit of taking out there all letters which arrived there to his address, during the session, and the same cases before relied on, from 16 Johns, and 4 Wend, are again cited. Now these cases only prove, that when a man has a residence at one town, and place of business at another town near the first, and that he transacts his affairs and receives his letters at the latter, notice to either is good.
Now Washington was not Walker’s residence or place of business, he was only there temporarily in discharge of public duties, and if such a notice be good, notice to a resident of this state, who is temporarily present two or three months at the Virginia Springs, and who takes out all letters which arrive there for him during his visit, will be bound by a notice to the Springs. But it is not the place, where a man absent from home on a visit, or on public business, takes out his letters for a« few weeks or months, that the notice avails, but to the place of business, where he receives his letters all the year. In the language of the court on this subject in 2 Harrison’s Reports, page 489, “It must not, however, be a place selected and used temporarily for the transaction of some particular business, as setting up some old books and accounts merely, but his regular and known place of business, for the transaction of his monied *671 concerts; ” and in 16 Louis. Rep. 20, the court say, “ although it is in evidence that he has been for many years in the habit of receiving his letters at Opelousas, and that they are not forwarded nearer his residence, it is not shown that he ever gave the postmaster any instructions to that effect,” and the notice was held insufficient. Opelousas was. not his place of business, and though he received his letters there, the notice was invalid.
The next reason given by the court in favor of the notice to Washington, is that, it is said, Walker had no agent to receive his letters arriving at Madisonville, in February, 1837, and the court say, this is proved by Claiborne and Williams. Why Claiborne was then at Washington, as a member of congress, and makes no reference to this subject, at least at this date, and Williams had removed to Adams county, in November, 1836 ; and, although on occasional visits to Madisonville afterwards, he does not say Walker h^d no! agent, but only that he knew of none. But he swears he knows Walker directed his letters to be sent there until February, 1837, and that they continued to come there, then, and afterwards. Now, is it not a fair inference, that Walker would not have directed his letters to-be sent there at that time, unless he had an agent there to receive them? And suppose the postmaster were dead, and he were Walker’s agent, how could the fact be proved ? But the contrary should be proved, in order to avail the plaintiff. But were this so, do not the court perceive that this is a reason, not to make Washington the proper place to send the notice, but to show no notice was necessary, and under this head the court resume this point. Does then proof that a man had left his house temporarily, closed it, and left no agent behind, dispense with any notice? On this point the court cite three authorities. The first is 3 Wend. 408, in which the statement is, “ at the time the note was discounted, it was known to the officers of the bank, that the defendant resided at Geddes, and a memorandum of his then place of residence was made on the note, in conformity to the uniform practice of the bank in.such cases.” Here the notice to Geddes was held good, although the indorser, unkn'own to the *672 bank, had removed from Geddes a few weeks before the note fell due. This was a case of notice given, and not of.no notice, and its analogy to this case is not perceived. The court proceed to say, “ In an elementary writer the rule is clearly laid down, that if the house be, locked up, and no person there in consequence of the temporary absence of the party, it is not necessary to leave a notice at the house, or ascertain where he has gone to. Bailey, 273. And this rule was fully recognized in Williams v. Bank of the United States, 2 Peters, 96. This writer was not Bailey, but an American compiler, and the meaning of the whole is, that if due diligence is used, by calling at the house to give the notice, then, in the case stated, the notary need not “leave the notice at the house.” That this is so, is proved by the only two cases to which the compiler refers for this rule. The first is 2 Peters, 96, which the court state as follows : “ That the notary public, after the protest of the notes and the expiration of the usual day of grace, called at the house of the defendant, Williams, who resided in the city of Cincinnati, which he found shut up, and the door locked, and on inquiry of the next resident, he was informed that the said Williams and family had left town on a visit, whether for a day, or week, or month, he did not inquire. He made use of no further diligence to ascertain where Mr. Williams had gone, or whether he had left any person in town to attend to his business. The witness left a notice at the house of a person adjoining, with a request to hand it to the defendant, when he should return.” This was a case of notice left as stated, and of “ diligence” in an attempt to give a notice at the domicil. This case at most could only prove, that after inquiries and diligent' efforts to give the notice at the domicil, it was not necessary to leave it at the house, when it was locked, and all absent, especially when left for the indorser with the next door neighbor. This was a question of diligence, and the decision was, that all these inquiries, these efforts to give the notice at the domicil, and leaving it with the next neighbor for the indorser, were sufficient. But is it said that where'there is no diligence, no inquiries, no efforts to give any notice, that all notice may be dispensed with, on proof of *673 ihe house being closed, and temporary absence of the indorser and family 1
■Why then this studious effort to show this call at the house, ‘ these diligent inquiries and efforts to give the notice, if none were required % In this case of 2 Peters, 98, Sergeant, the distinguished lawyer of Philadelphia, by whom the case was argued, for the notice, says, “The obligation is to call at the dwelling-house of the indorser, or at his place of business, and if he has left no one there to attend to his affairs, it is his loss, and the holder has done his duty.” Nojw this truly great lawyer admitted, “ the obligation to call at the dwelling house of the indorser,” in this very case in which was proved the temporary absence of the indorser, with his family, the' house locked up, and no one there, but in no case was it ever decided, that the mere closing of the house, leaving no one there during a temporary absence, dispensed with all attempts to give a notice. The only other case cited by the compiler, is 2 Caines, 121, in which an attempt was made, in case of a temporary absence, to give notice at the dwelling-house, and finding it closed, the notice was put into the key-hole. But was the house of Walker unoccupied! Was there no one there 1 Of this there is no proof, and as the plaintiff relies on this to excuse want of notice, he should have proved it affirmatively. But the court say, the notice to the domicil would be “useless” in case of such absence, and no one at the domicil. It is respectfully answered, that the law requires the diligent efforts to give the notice, that the law permits no such inquiry, but the contract of indorsement is, that if the indolser has a residence, a notice there, or diligent efforts to give him a notice there, aré'conditions precedent of his liability, and cannot be expunged by proof, that it would have been useless to have performed these conditions. If it be asked, why send the notice to the residence, when there is no one there to receive it 1 the answer is given by Judge Story: “ It is of no consequence that the drawer or indorsers may not have been prejudiced thereby.” Story on Bills, page 445, art. 377. “ He has a right to stand upon the terms and conditions of his contract, and to require a strict fulfilment of duty on the part of the holder in giving him *674 notice. Hence it will constitute no excuse for want of notice, that the drawer is insolvent, or that fromother causes, the party entitled to notice, could not have sustained any injury or prejudice.” Story, page 346. “ Nor that the drawer or drawee are non-existing or fictitious persons.” Story, page 361. “ Nor that the drawer and indorser belong to the same firm.” Story, page 445. “.So the fact that the drawer of the biil is dead at the maturity of the bill, and that the indorser is appointed his administrator.” Story, page 445. Nor the death of the indorser; notice should be “sent to the residence or domicil of the deceased party,” even though he have no representatives.” Story, pages 305, 344, 361, 403, 425. “ Notice means something more than knowledge,” “ it must be legal notice,” “ otherwise it is merely a historical fact.” “ The rule is inflexible, and it is not open to the inquiry, whether notice could have availed the indorser.” “ I am not for relaxing one jot further than it has been done this wholesome and convenient rule.” 16 Serg. & Rawle, 157. In the case of the death of the indorser, having no representatives, we see notice must be sent to the late residence, yet have the dead any agent, or can they see or hear of the notice ? In the note to Story on Bills, 331, Judge Kent lays down the doctrine, quoted with approbation by Judge Story that the notice should be given, or attempted to be given, at the domicil, even “if the house be shut up by a temporary absence.” Now no one has studied this subject so much and so long as Judge Kent, as well during his long service on the Bench, in the great commercial state of New York, where so many of these cases arose, as since, in his able treatises on these questions, so often revised, re-considered, and republished by him. His opinion, as above quoted, seems clear; but to remove all doubt as to his meaning, I submitted this case to him last spring, and the result in my favor, on all the points, was laid before the, court last spring. Surely when there is such high authority, and the court is divided, a re-hearing will not be refused? A decision in Mr. Webster’s case is cited in Judge Clayton’s opinion, but we have nothing but a sketch, in nine lines, of Judge Shaw’s views, and on a re-argument, we can have the whole opinion. It seems, *675 from the brief statement in that case, the court presumed Mr. Webster received the notice, but if not sent to the domicil or place of business, the law permits no such presumption. Thus in 5 Yerger, 71, the court say, “ Whether a party received notice or not, must not depend on probabilities, but must be established by proof.” In the decisions of this and other courts, it is held, that if the indorser resides in the town where the note is protested, and notice» be placed for him at that post-office where he receives his letters every day, the court will not presume that he received it; no, not even in the strong case, approved by this court in H- John. 231, where he directed the letter-carrier to bring him his letters every day, and he did so. Yet surely the presumption is much stronger in those cases, than in this, that the notice was received.
There is one point appearing on the record, and presented in the first brief submitted with the case, which has been overlooked by the court. It is thus stated in the first brief, “ Now here the equity was clearly with the defendant, it being clearly proved that the plaintiff could have made the money from the principal, had he proceeded in time. On all these points the law is believed to be with the defendant, and they would each be separately and strongly pressed, were it not believed that the main point was clearly with us., and that the court would decide the case on that point.” Now had the court decided the main point in my favor, it would have been unnecessary to touch this point, but as the case cannot be decided against me without deciding this point, the case should be reconsidered. The words of our statute are, “ and the person or persons to whom such instruments so payable are assigned, may maintain an action against the person or persons who shall have indorsed or assigned, the same as in cases of inland bills of exchange. Provided that when any debt shall be lost by the negligence or default of the assignee or assignees, that the assignor or assignors shall not be liable, any such assignment notwithstanding.” The law seems clearly to embrace this case, the debt, as against the maker, having been “ lost .by the negligence or default of the assignee.” On this subject, making justice the law, there are many analogous statutes and decisions of our sister states, *676 maintaining this defence, which will be presented on reargument, and many distinguished lawyers in this state, are known to entertain the same opinion. Even if the strict law is against me, on a motion for a new trial, the verdict will not be disturbed, if there has been no misdirection of the court as to the law, provided the equity and justice of the case are with the verdict, and especially in a “ hard case,” as the court admit this to be. Graham on New Trials. A motion for a rehearing within the four days, was prevented by the-following causes. At the last July term, Mr. Walker wrote and requested V. E. Howard, should the case at any time be decided against him, to move the rehearing in time, which would have been done, but for the fact of Mr. Howard’s absence, and that his brother and partner, tq whom he had entrusted his business, was confined to his bed by severe illness at the time of the decision, and for more than four days afterwards, and the plaintiff being dead at the time, no judgment could be rendered. A rehearing and reargument are requested then, because,
1. Many material errors as to the facts, are contained in the opinion.
2. These errors the court would not permit to remain and influence the jury on anew trial, and therefore should be corrected on a rehearing, in any event.
3. For errors of law.
4. For the omission to decide the question presented by the record, and by the first brief as to the discharge of the assignor by “ the default or neglect of the assignee.”
5. Because the court admit it is “a hard case on Mr. Walker,” and where justice and equity are with the verdict, it will not be disturbed on a question of strict law, where there has been no misdirection as to the law.
6. Because all these important questions were decided by a divided court.
7. Because it is a well known fact, and now proved, that the plaintiff in error was dead at the time of the judgment, and therefore no judgment could be entered in his name ; and the best way to correct this error, is by granting a rehearing. It is *677 indispensable, in all courts, that there should be parties, a plaintiff and defendant or no judgment can be rendered; and as there was no party in court at the time, in whose favor a judgment could be rendered, the defendant and his counsel were not in default, and the four days rule can have no application to such a case, especially as our,statute as regards cases pending “ in.any court,” requires a revival in case of death of either party, and such is believed to be the invariable practice in this court. If the party, when temporarily absent, must have an agent at the domicil, in order to entitle himself to notice, or an attempt to give notice there, then the rule must go farther, and require that the agent should have power, not only to take out all letters arriving at the post-office of the domicil by mail, but also power to open and read these letters, even though sealed, otherwise the notice-to the domicil of the absent person by mail in a sealed letter,' which the agent cannot open or read, is just as “ useless” as the court deem a noticé when there is no agent. But it may be said the agent would forward such notice to the place where the indorser is staying temporarily, and were this so, would it not be quite as “ useless” in this case, as to have sent no notice to the domicil, inasmuch as the agent would only have sent, the letter sealed and unopened to the same place, where the notary would have sent it himself? Such is the confusion arising from inquiring into the usefulness of the notice, or the probability of its reception, and departing from the plain and well established rule, which requires, in all cases, notice, or diligent efforts to give the notice, at the domi-cil or place of business. ' - R. J. Walker.
We concur in the opinion that a rehearing ought to be had, and reargument ordered in this case.
V. E. Howaed,
R. M. Gaines,
J. A. Quitman,
- W. YeegeR,
£ Geo. Adams.
The following affidavits were filed, in support of the petition for a rehearing:
*678 B. D. Howard, one of the counsel in the above case, being duly sworn, says; Tha,t during the present term of this court, he has been too much indisposed to attend the same, and when the above stated case was decided, he was prevented by ill health from moving the court for a re-argument, within the four days allowed by the rules.
B. D. Howaed.
Sworn to and subscribed before me, this the 11th day of November, A. D. 1843.
J. H. Boyd, J. Peace, in and for the county of Hinds, State of Mississippi.
Albert Tunstall, plaintiff in error, v. R. J. Walker, defendant in error.
In High Court of Errors and Appeals, State of Mississippi.
H. T. Ellett, being swoi’n, saith; That Albert Tunstall, the above-named plaintiff, died in the month of September last.
H. T. Ellett.
Sworn and subscribed, this 11th November, 1843, before me,
L. L. TayloR, J. Peace.
R. J. Walker, the defendant in error, being sworn, saith ; That he would have attended at the present term of the court, to move a re-hearing, within the time prescribed by the rule, had he not felt certain, under the circumstances of the case, that no judgment would be entered up against him at this term.
R. J. Walker.
Sworn to and subscribed before me, this the 11th day of November, 1843. L. L. Taylor, J. Peace.
The following is the opinion of Chancellor Kent, referred to in the argument of Mr. Walker : '
“ 1. If the residence of a member of the senate of the United States is in the state he represents, would a notice of protest to him, as indorser, directed to Washington city, be good, on proof that, at the date of the notice, he was present in Washington city, during the session, and that he was in the habit of receiv *679 ing there all letters to his address, there being no diligence or inquiry as to the residence, and the fact of his residence in the state being established by proof?
Answer. I am of opinion, that the 'notice in the case stated would not be sufficient; assuming, as we may, from the statement, that the notice was not proved.to be actually received by the indorser, on the arrival of the notice at Washington., Whether notice, if so personally received, would be sufficient, without notice at the permanent domicil of the party, in his own state, I give no opinion.
(Signed) James Kent.
2. Under the circumstances above stated, is not notice required to his residence, or place' of business, in the state he represents, although his family be .absent with him, during the session, and no agent left in the state?
Answer. I am of opinion, that the notice is required to be given at the residence of the indorser, in his own state.
(Signed) James Kent.
3. Does a' member of the senate of the United States forfeit his residence in the state he represents, and the privileges incident to such residence, by attending the sessions of congress, at Washington city, and receiving there all letters to his address, his family spending the session, and sometimes the recess, at Washington? ' f
Answer. I think not. There is no change of domicil, or home. The residence at Washington is temporary, and for a special purpose.
(Signed) James Kent.
4. Will a-no tice of protest'to a member of the senate of the United States be good, if left at, or directed to, any other place or house, where he may be staying temporarily, than his residence, or place of business, in- the state which he represents, and in which he resides, there being no diligence or inquiry to ascertain the residence or place of business ?
Answer. I think not; excepting, however, the question, whether service of notice actually made on person, out of his state, or distant from his home, would alone be sufficient. The *680 inclination of my mind is, that it would not be sufficient; but I give no decided opinion on that point.
(Signed) James Kent.”
Montgomery, in opposition to the petition.
As to the application for a re-hearing, I am satisfied I cannot make a stronger argument in favor of the justice and propriety of the decision of the majority of the court, than that contained in the opinion; but I will notice a few of the positions taken by the petitioner.
The position relied on is, that the court erred, as to the evidence of the defendant on the 4th of February, 1837; and it is contended, that the conduct of defendant, after that date, is not to be regarded in discussing that question. Now, I think it is a perfectly legitimate argument, to test a man’s declarations by his acts. But I will not hesitate to admit, that defendant was candid in his statements to Claiborne and others, that he intended to continue his residence; but as the proof is fall and uncontradicted, that he never did reside there, after the' sale to G. R. Fall, nor kept furniture, servants, or anything else there, it would be a perversion of language to call it his residence. If such can be considered a residence, then a man may have his residence in a place far distant from the place where he usually or uniformly lives and transacts business.
All the authorities which speak of the necessity of sending notice to a man’s residence, during his temporary absence, instead of sending it to the place he is supposed to be, give, as a reason, that it will be received by his family, or some agent who, knowing where he is, will forward it, so that he will be speedily and certainly informed of the dishonor, in time to protect himself. But the authorities concur, that if the holder call at the residence, to give notice, and find the door locked, and the family, &c., from home, although temporarily, he need not give notice, but has used all the diligence the law requires. Now, if the notary had gone to “ Pearl Dale,” and found the house vacant, as the proof abundantly shows, and Mr. Walker contends was the case, would it not, under the authorities, have excused notice Í
*681 The law never requires a vain and foolish thing; and we can scarce conceive of anything'more vain and foolish, than such a trip to Pearl Dale, on the 4th of February, 1837. It is proved that Mr. Walker and his family were more than one thousand miles from that place, and had not left even a cock to crow at Pearl Dale.
But I take the broad ground, that the defendant did not, on the 4th of February, 1837, reside at Pearl Dale, neither potentially nor intentionally.
To prove this, let us inquire who was the owner of Pearl Dale at that time. Mr. Walker produced the supplemental contract with Fall, which shows that there was a principal contract, of conditional sale. What these conditions were we are not informed; but from all the evidence, we are forced to the conclusion, that the conditions were complied with, as it is -prhved' that Fall took possession with the approbation of Mr. Walker, as is evident from the remarks made by Mr. Walker to Williams, and also the-proof, by Claiborne and others, that Fall continued in possession, until he sold to Puckett, and nothing is said about a forfeiture for non-performance of any condition. But Mr. Walker could have proved the condition, and that the title was retained by him, if such were true, and should have done so.
Admit that no technical conveyance of title was made, does that constitute Walker the owner of the land 1 To constitute perfect ownership, right of property, right of possession, and actual possession, must concur. Walker had neither. At most, he held the mere legal title, while the right of property was in Fall, who, on the performance of the conditions of sale, could have compelled a conveyance. If these conditions had not been performed, why did not Walker complain that Williams did wrong, in delivering possession of the land and slaves'?
Again, Williams says he gave possession on the faith of the contract, and without instructions from Walker. And Walker told him, he should have given possession of the land and slaves, but not of the house; which shows that the conditions *682 of sale must have been complied with. But Williams put the right construction on the contract.
The supplemental agreement only reserves the right to occupy the house, “ during the recess- of congress,” under which, the fair construction is, that Fall was entitled to the use of it, at least during the session of congress, if not all the time that it was unoccupied by Walker, or his family. The agreement is only permission to Walker, personally; he could not transfer or assign it, nor could he require that it should remain unoccupied. He could only require the use of- it, by actually taking possession ; and having never taken possession proves, that he never made his election to occupy it, and until such election, he had no right under the contract. By reading the contract, it will be seen that the land to be reserved is not to include this dwelling-house, which shows that the intention of the parties was, that the ownership of the Pearl Dale house was to pass, by the contract, to Fall, and the mere privilege of occupancy, during the recess of congress, to be reserved.
Now I would ask, if, under this contract, Walker had a clear legal right to occupy that house during the session of congress 1 Had he a right to have his family there % Had he a right to have an agent there 1 These questions must be answered in the affirmative, otherwise it must be conceded that Walker did not intend to reside there at the time the note was protested.
A word or two on some of the authorities relied on. Story, Con. Law, 96. “ A domicil once acquired, remains until a new one has been acquired, and the presumption, in all cases, is against a change of domicil.” The author evidently uses the term domicil in a political sense, and not as designating the dwelling occupied by a.man and his family. For it would be absurd to say that a man could not sell his dwelling until he had purchased another, which would be the meaning of the sentence, unless we construe domicil to mean the district or section of country in which a man exercises his political or civil rights, and not his habitation. A man may reside in Jackson, and exercise all his political and civil rights there, call it his domicil or home, yet never eat two meals at the same table, nor *683 sleep twice in the same bed or gutter ; nor have his shirt washed. The case Somerville v. Somerville, 5 Yesey, 756, was not a question where a man had his habitation, and might be seen by those having business with him, but of what state or country he was a citizen, and to what laws he owed allegiance. And it was correctly decided, that, as he was a Scotch peer, and entitled to a seat in parliament as sitch, that he must be regarded as a citizen of Scotland, notwithstanding he resided, or had his habitation in London. But we are, in this case, inquiring where Walker had his habitation, where he dwelt, on the 4th February, 1837. His political domicil, or residence, was not changed^ we admit. We had business with him personally, and the law made it our duty to ascertain where he dwelt permanently, and to comniunicate with him there. Now, where was that place ? He was not at Pearl Dale, his family was not there, nor anything else that was his; nor had they or he any right to be there at that date.
Suppose this note had been protested at Washington city, and the notary had been á personal friend of Walker, and in the habit of daily intercourse with him and his family; and had gone to the rotunda of the capitol, and, looking into the senate .chamber, saw Mr. Walker in his place, had inquired of Judge Black for the residence of M-r. Walker, and been informed it was at Pearl Dale; and, instead-of giving Walker the notice, had travelled off to Pearl Dale, and finding a log cabin, shut up, uninhabited, and, on inquiry of Fall, had ascertained that Mr. Walker had no right to occupy the house, except during the recess of congress, would that have been sufficient diligence to excuse the failure to give notice? Mr. Walker contends that Cook, who knew he was at Washington, should have used some such diligence to' ascertain his residence, when all the diligence he could have used, even to going to Pearl Dale in person, must have resulted in ascertaining the facts, which he knew at first, that Walker had no residence, or right of residence there, on that day, and was, in fact, in Washington city.
As to the judgment, I admit it should not have been entered until revivor; but that can be set aside, and leave granted to *684 revivo, without ordering a re-argument. The parties were all alive when the cause was argued. The death between verdict and judgment, does not prevent judgment, &c.
On petition for re-argument by Walker.
Mr. Chief Justice ShaRKey delivered the following opinion on the application for a re-argumcnt.
Having examined the petition for re-argument, I have but little to say on what I regard as the merits of the case. I see no reason whatever for changing my opinion; if I could perceive any ground for a doubt, under the circumstances of the case, I should incline to grant the application. The opinion may be wrong, but I think, on re-argument of the same questions, I should be forced to come to the same conclusion.
There are some circumstances, however, connected with the petition, which I feel bound to notice, and I do so because the petition itself has confirmed me in the propriety of having the case retried in the court below. The case was submitted on lengthy briefs in April last. After the'submission the. counsel were indulged in filing additional arguments, without the consent of the opposite counsel. A brief of thirty odd pages was submitted, which contains a very able and ingenious argument. After full examination the case was decided, and a new trial granted. In the petition a new ground is assumed. It is insisted that the holder lost his recourse under a statutory provision, by not suing the maker in time. This is a question of importance, and it is a -new one. The record does not show that it was made in the court below, where properly it should have been made; nor does the evidence present it in such a shape as to justify a decision on .it, for the only evidence on which it could rest is not free from vagueness, and there is strong circumstantial evidence tending to contradict it. We could not decide it without weighing the evidence. We could not decide it unless we "should undertake to do so on a very doubtful case, and that too without anything to show us that it ever entered into the consideration in the court below. Nay, *685 move, we have satisfactory proof that it was not considered below. I quote the language of the brief already referred to. “A new declaration was filed (alluding to the amended declaration) averring, as an excuse for not giving notice, that the defendant had'no known place of residence, and on this the issue was joined and cause tried, on this one single, simple and material point.” But again ; this question, important as it is, was totally neglected in the first argument. In the very lengthy brief it occupies but three lines, and then it is only incidentally touched, as an argument to show that the equity of Jhe case is with the defendant. Under such circumstances we should be doing injustice to the question, injustice to the cause, and injustice to ourselves, to reinvestigate on this ground. When it does come up we wish it to come fairly, and it cap only be fairly made by remanding the cause for a new trial. If it was a matter constituting a good defence before, it will also-be good when presented in a more prominent form. It is a defence which is not likely to be lost before another trial' can be had. I feel bound to add too, that a re-argument is not a matter of the same moment when a new trial only has been. granted, that it is when the judgment is final. I should be inclined to yield more readily to an application on a final judgment, because the prejudice is not so serious in case the decision should be wrong.
But there is another strong reason for refusing a re-argument in the present case. The whole of a lengthy argument was directed to the sufficiency of notice. Counsel must cover the whole ground on the first argument. It will not do to sanction experiments on_a single point, and if that fails, then allow a change of position. On this principle, litigation would be endless.
Accompanying the application there is an affidavit on which perhaps much reliance has been placed. The cause was argued and submitted in April, and by the court taken under advisement. ' In September it appears by the affidavit, the plaintiff’ in error died, which was before the final decision, but after submission'; and it is said this is a reason' why a re-argument should be granted. If there was anything in this point, the application *686 should have been made to set aside the judgment. An application for re-argument directs itself to the propriety of the opinion on the merits of the case, and not to any accidental circumstance which would make it improper to render judgment. By setting aside the judgment, and ■ reinstating the case, a re-argument would follow, but then it would be a mere consequence, without reference to the propriety of the decision. But this affidavit presents no obstacle whatever, and the question is so well settled that I will barely refer to a few of the authorities. In Bemus v. Buckman, 3 Wendell, 673, King v. Dunn, 21 Wendell, 253, and Green v. Watkins, 6 Wheaton, 260, this point was directly decided, in cases too which had not been submitted before the death of the party. The rule is that judgment shall be entered as of a term previous to the death of the party. In cases taken under advisement our judgments should always be^ entered nunc pro tunc, and the judgment must be so amended in this instance, and then it can be revived.
Note by the RepohteRS. This cause was decided by the court, in October, 1843, and should have been reported in the first volume of Smedes and Marshall’s Reports. The preparation of the case, however, for report, was delayed for the purpose of obtaining the brief and petition for re-argument, of the defendant, which were needed to make the report of the case complete. The latter was furnished to us after the second volume was partially through the press; the former was mislaid, and could not, therefore, be obtained.